**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Pamela McIlwain, | : | Case No. 1:04CV0606 |
|               Plaintiff | : | |
| v. | : | Magistrate Judge David S. Perelman |
| Ohio Department of Mental Health, Northcoast Behavioral Healthcare System, | : | |
| | : | **Memorandum Opinion** |
|               Defendant | : | |

This case is before the Court on the motion of defendant, the Ohio Department of Mental Health ("ODMH"), Northcoast Behavioral Healthcare System ("NBH"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff, Ms. Pamela McIlwain, initiated this action against the defendant alleging that she suffered retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-2(a)(1), and sexual harassment, in violation of the Ohio Civil Rights Act ("OCRA"), Ohio Revised Code §4112, et seq. On November 28, 2005 this Court granted plaintiff's motion to amend her complaint to exclude the sexual harassment claim, so it is only the retaliation claim which remains at issue.

Plaintiff was hired in 1988 by ODMH, an integrated health care system for individuals with disabling mental illnesses and emotional disorders. ODMH operates a number of organizations which provide inpatient mental health treatment, one of which is NBH, which operates Community Support Networks ("CSN"), to provide residential support programs for patients who receive 24-

hour care in a community environment.

Plaintiff was hired to work with NBH as a therapeutic program worker ("TPW") assigned to work in a number of group homes operated by NBH, and in January of 2001 she was transferred to a CSN known as the Walnut facility, which provides full-time mental health treatment for patients aged 55 or older. She was assigned to the first shift, from 7:00 a.m. until 3:00 p.m., during which time she would assist patients with daily living activities, prepare meals, purchase food and take residents on outings. Mr. Doug Kerns, Residential Program Manager, was her supervisor.

Plaintiff alleges that one co-worker on her shift, Mr. John Martin, engaged in the following behavior which ultimately led to her raising allegations of sexual harassment and retaliation: (1) he directed curse words at the patients; (2) on one occasion he stated, "I am tired of the bitches at this house"; (3) on another occasion while she was in the same room he began to rub his genitals while talking on the telephone; (4) he spoke to her about a former female co-worker of his who preferred sexual contact with females over males; (5) on another occasion he passed close to her and brushed against her breast; (6) he told plaintiff that he could have any woman he wanted including her; (7) in her presence he once used the term "ho" or "whore," although not referring to her; and (8) he followed her from room to room at the Walnut group home.

Upon deposition plaintiff testified that in October of 2001 she verbally told Mr. Kerns that she "was tired of John's harassment, and that [she] wasn't looking for a man," to which Mr. Kerns responded by laughing. She admitted in her testimony that she did not elaborate any further regarding the actions of Mr. Martin, and that she did not express her complaint in writing to Mr. Kerns or any other member of management prior to April of 2002. It was not until eight months later, at a pre-disciplinary hearing addressing numerous disciplinary actions against plaintiff, that

2

Mr. Kerns learned that the foregoing comment had been meant to inform him that she was being subjected to sexual harassment by Mr. Martin.

The disciplinary actions against plaintiff included the following.

In February of 2002 plaintiff was late to work twice within a single two-week work period and, in accordance with NBH policy, was subject to discipline for her tardiness.

In an affidavit Ms. Georgia Brokaw, Labor Relations Manager at NBH, stated that on March 9, 2002 plaintiff was absent without leave for a total of eight hours, after she failed to appear for her shift and failed to contact her supervisor with an excuse. Plaintiff claims to have been working on that date.

Mr. Kerns testified upon deposition that in February of 2002 plaintiff called him and left a message indicating that she planned to leave the Walnut facility to get some lunch for herself. Such action was contrary to the policy prohibiting employees from leaving the premises to attend to their personal business. Because Walnut was a residential care facility, the staff was required to stay on premises for the entire shift unless prior approval was given to take patients off-site for planned activities. Mr. Kern immediately contacted plaintiff and told her that her request to leave the premises to attend to personal business was not approved, at which point plaintiff told him that she would take a resident with her so that her outing could be considered a resident outing. Mr. Kerns told her that merely taking a resident along on personal business did not make it an approved outing, and that he continued to disapprove of her plan. Shortly thereafter he received another voice message in which plaintiff stated that she had left the facility and taken a resident with her to "the store." Plaintiff returned from the outing with a bag of food for herself, but the resident who went with her informed the staff that he was hungry. Plaintiff denies having been told not to leave the

3

premises.

On February 21, 2002, Mr. Kerns was contacted by a representative of Eden, Inc., the company which owned the Walnut facility, and informed that for January Walnut had exceeded the 73 calls allotted per month and had incurred extra charges. Although NBH provides telephones for each of the residential facilities those phones are to be used for business and client needs, with only minimal use by staff for personal calls unless supervisors give permission for such calls.

During a "request for information" inquiry, plaintiff stated that she always used her cell phone for personal calls. However, when Mr. Kerns investigated he found that plaintiff had been responsible for several of the outgoing calls,[1] four of which had been 18 minutes or longer in duration. Plaintiff subsequently admitted having made the calls due to some sort of family difficulty, but she had never requested from her supervisor permission to use the phone for personal calls.

On March 1, 2002, Mr. Martin contacted Mr. Kerns and then filed a report with NBH police after a confrontation with plaintiff. Mr. Martin stated that he had assisted Mr. Kerns during an afternoon of cleaning and organizing the facility, after which plaintiff confronted him in front of residents and called him an "Uncle Tom," as well as other insulting comments. Plaintiff later admitted having made the comment to Mr. Martin, but claimed that it was taken out of context.

On April 9, 2002, Ms. Kurstyn Allen, a staff member at Walnut, contacted Mr. Kerns to inform him that she had observed plaintiff clocking another co-worker, Ms. Felicia Earl, into work while clocking herself out, and that she had observed the same conduct on other occasions. NBH policy prohibits one employee from clocking in another employee. Unbeknownst to plaintiff, Ms.

---

[1] Outgoing calls were logged.

Earl, who regularly started work at Walnut at 3:00 p.m., met Mr. Kern at NBH in Northfield at 3:00 p.m. Nevertheless, payroll records indicated that she was clocked in at Walnut at 2:58 p.m. Plaintiff denied having clocked in her co-worker.

On April 18, 2002 plaintiff received notice of a pre-disciplinary conference to address allegations of absence without leave, tardiness, insubordination, failure of good behavior, and dishonesty. That pre-disciplinary conference was held on April 24, 2002, and it was decided that plaintiff's employment should be terminated. During the pre-disciplinary conference, plaintiff produced for the first time a handwritten memo asserting her claims of sexual harassment by Mr. Martin over the course of the previous 15 months.

Plaintiff was issued a letter informing her that for each of the reasons outlined in the notice of pre-disciplinary conference she would be removed from her position of TPW at NBH. It was signed by Mr. Michael F. Hogan, Director of the Ohio Department of Mental Health, and dated May 8, 2002.

In a subsequent letter dated May 14, 2002 sent to plaintiff by Mr. Roger Beyer, Labor Relations Officer at NBH, plaintiff was given the opportunity to have her removal held in abeyance for 180 days during which time she was to be relocated to the Cleveland Psychiatric Hospital ("CPH") and was to enroll in the Employee Assistance Program ("EAP"). The letter further provided that if she was to complete the EAP without any further disciplinary problems her removal would be reduced to a five day fine. In a meeting held on the following day the terms of the agreement were explained to plaintiff, including that she was required to participate in EAP, contact weekly her EAP intake coordinator, and avoid any further workplace violations. Plaintiff agreed to the terms of the letter, and signed an acknowledgment stating that she attended the meeting,

received the letter outlining the terms of the agreement, understood the terms, and agreed to enter into the abeyance agreement. Her union steward also signed the agreement.

Plaintiff enrolled in EAP on May 16, 2002.

Meanwhile, Ms. Belinda Duncan, Equal Employment Opportunity ("EEO") Manager for NBH, conducted an investigation of the charges raised by plaintiff, during which she interviewed Mr. Martin, Ms. Earl, Ms. Allen and plaintiff, and reviewed statements, documents and personnel folders. She determined that there was no probable cause to the claims of plaintiff, and in June of 2002 reported her findings to Mr. Thomas Cheek, Chief Executive Officer of NBH. Ms. Duncan's affidavit states that prior to April 24, 2002 her office had not been made aware of any claim of sexual harassment by plaintiff.

On June 4, 2002 plaintiff filed with the Ohio Civil Rights Commission ("OCRC") her first charge of discrimination alleging sexual harassment and retaliation, in which she listed as her reasons for the retaliation charge: (1) the fact that Mr. Martin allegedly told her that he could have any woman he wanted, including her; (2) that fact that she "explained to Doug Kern about this activity, yet nothing was done[;]" (3) that Mr. Martin told her that she would be gone soon; and (4) that after engaging in "protected activity" she was removed from her work site, assigned to a different shift, and suspended.

Plaintiff began her assignment at CPH with Ms. Mary Ann Pason as her supervisor. Ms. Pason required plaintiff to complete a "Standards of Performance" checklist, a copy of which she provided to plaintiff on June 7, 2002 with instructions to complete and return it to her by 7:00 a.m. on June 13, 2002. Plaintiff failed to do so.

On June 14, 2002, Ms. Pason sent plaintiff a second memo reminding her of the importance

of checking her mailbox daily and of the need to complete the checklist by June 17, 2002 at 7:00 a.m. Plaintiff claims not to have been assigned a mailbox until mid-June of 2002, nearly one month after she began to work at CPH. Once again, plaintiff failed to complete the checklist by the appointed deadline.

Ms. Pason confronted plaintiff as to why the checklist had not been submitted, at which point plaintiff responded that she had been unable to complete it because she was still in orientation and had been too busy to retrieve it from her mailbox. She finally completed the checklist and submitted it on June 20, 2002.

During her two-week orientation program at CPH plaintiff was also requested to complete an Orientation checklist and a training report and to submit them at the end of the two-week period, which was not done. On June 25, 2002, Nurse Danszczak confronted plaintiff about the checklist and report, to which plaintiff responded that she had completed them but that if Nurse Danszczak had not received them she would provide copies.

On July 2, 2002, Ms. Pason also inquired as to the checklist and report, to which plaintiff responded that she had never received the forms and would obtain them from the Education Department. Plaintiff was instructed to follow up with Ms. Pason by the end of the week. Again, plaintiff neglected to submit the forms by that time.

Ms. Pason sent another memo dated July 23, 2002 to plaintiff, once again informing her that the completed forms had to be submitted to her by 7:00 a.m. on July 30, 2002. The forms were never submitted.

Plaintiff denies having received copies of the aforementioned forms.

Ms. Cynthia Penn, EAP Intake Coordinator, provided the following evidence by way of

7

affidavit regarding plaintiff's involvement, or lack thereof, with the EAP.

At the outset of plaintiff's enrollment in the program, plaintiff signed a Participation Agreement outlining the requirements of participation in the EAP and was instructed on the necessity of keeping in weekly contact. Ms. Penn then reminded plaintiff of that obligation in a registered letter dated June 5, 2002. On June 11, 2002, plaintiff contacted Ms. Penn and stated, "I know I should be keeping in better touch, but I've been busy." Ms. Penn telephoned plaintiff on July 5, 2002 to once again stress the importance of the weekly contact responsibility. In a registered letter dated August 23, 2002, Ms. Penn again addressed the weekly contact issue with plaintiff. As of that date Ms. Penn had not heard from plaintiff for three weeks, causing her to direct plaintiff to contact her within the following week. Plaintiff did not comply with the direction.

As a consequence of the foregoing, on September 18, 2002 Ms. Penn sent to plaintiff a registered letter informing her that the EAP was "declaring [her] out of compliance with [her] Participation Agreement[,]" as she still had not heard from plaintiff since July 30, 2002.

Plaintiff claims to have kept in weekly contact with Ms. Penn during the entire time period in question.

In a letter dated October 17, 2002 directed to plaintiff by Mr. Beyer she was notified that she was expected to appear at a pre-disciplinary conference on October 30, 2002, to be held before Hearing Officer Sandra Rahe. She was also informed that she was being charged with failure to comply with the terms and conditions of the EAP Agreement, with insubordination for failure to carry out a work assignment and with willful disobedience of a direct order by a supervisor for failure to timely complete the required checklists.

The October 30th conference was held, and plaintiff was removed from her position as TPW

effective January 20, 2003.

On March 27, 2003 plaintiff filed her second charge of discrimination, alleging that NBH had terminated her in retaliation for having reported sexual harassment and having filed a prior OCRC charge.

She was issued a right to sue letter on December 31, 2003 and filed the instant case on March 30, 2004.

The defendant argues that summary judgment is warranted in light for the reasons that plaintiff cannot establish a prima facie case of retaliation, that the NBH had legitimate business reasons for removing plaintiff from her position, and that there is no evidence that those reasons were pretextual.

The plaintiff argues in response that summary judgment should be denied considering that she has established issues of material fact on her retaliation claim, that the rationale offered by defendant for the adverse action taken against her did not constitute a legitimate non-discriminatory reason, and that the reason for the adverse action was pretextual.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193 (6th Cir. 1974); 6 Moore's Federal Practice 56.15 [1.-0].

It is the initial burden of the moving party to demonstrate the absence of a genuine issue of material fact as to an essential element of the claims brought by the non-moving party. Curto v. Harper Woods, 954 F.2d 1237, 1241 (6th Cir. 1992); Wilson v. Zanesville, 954 F.2d 349, 350-351 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989).

In Street v. J.C. Bradford & Co., supra, the Sixth Circuit Court of Appeals reviewed three then recent decisions of the United States Supreme Court addressing summary judgment practice, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).[2] The court summarized those cases as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind issues (such as discriminatory action) are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt

---

[2] After the passage of a number of years the court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true, but the characterization of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

10

as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". Id. at 1479-1480 (Footnotes and citations omitted.)

Under Title VII an employer may not discriminate against an individual with regard to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).[3] Title VII also prohibits discrimination "against any...employee or applicant...because [the employee] has opposed any practice, made an unlawful employment practice by this sub chapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this sub chapter." 42 U.S.C. §2000e-3(a).

In order to establish a prima facie case of retaliatory discrimination a plaintiff bears the burden of showing: (1) that he/she engaged in an activity protected by Title VII; (2) that the defendant knew of the activity; (3) that he/she was subject to an adverse employment action; and (4) that there is a causal connection between the protected activity and the adverse action. Singfield v. Akron Metro. Housing Authority, 389 F.3d 555, 563 (6th Cir. 2004); DiCarlo v. Potter, 358 F.3d 408, 420 (6th Cir. 2004); Wade v. Knoxville Utilities Board, 259 F.3d 452, 463 (6th Cir. 2001); Nguyen v. City of Cleveland, 229 F.3d 559, 563-64 (6th Cir. 2000); Johnson v. U.S. Dept. of Health and Human Services, 30 F.3d 45, 47 (6th Cir. 1997). In order to establish the fourth element so as to avoid summary judgment a plaintiff "must produce sufficient evidence from which an inference can be drawn that [the defendant] took the adverse employment action *because* [plaintiff]" engaged in a protected activity such as filing a discrimination charge. (Emphasis added.) Singfield

---

[3] The Ohio Supreme Court has held that federal cases interpreting Title VII may also be applied to cases brought under the OCRA. Plumbers & Steamfitters Committee v. Ohio Civil Rights Commission, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981).

11

v. Akron Metro. Housing Authority, supra at 563.

When a prima facie showing of discrimination or retaliation is made there is a rebuttable presumption that the employer has engaged in impermissible conduct. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). At that point the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment decision. McDonnell Douglas, 411 U.S. at 802; Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1214 (6th Cir. 1996).

Stated differently, that presumption may be rebutted by the production of evidence that "the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1982 (6th Cir. 1994) (quoting Texas Department of Community Affairs v. Burdine, supra at 254). Once the employer has met the foregoing burden of production the presumption of discriminatory animus is no longer in effect.

If there is negation of the presumption of discriminatory animus the factfinder is back to square one, and must determine whether the challenged employment action was motivated by discriminatory animus, taking into consideration all evidence of record, including any evidence indicating that the reason articulated by the employer for the action was pretextual. A plaintiff may accomplish this either by showing that the proffered reason is unworthy of belief, or that the true reason for the his/her rejection, notwithstanding the proffered reason, was of a discriminatory nature. Goostree v. Tennessee, 796 F.2d 854 (6th Cir. 1986), cert. denied, 480 U.S. 918 (1987).

> "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1982 (6th Cir. 1994) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089,

12

> 1095, 67 L.Ed.2d 207 (1981)). *In order to challenge the credibility of an employer's explanation, the plaintiff must show by a preponderance of the evidence: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the adverse employment action; or (3) the proffered reasons were insufficient to motivate the adverse employment action.* See Manzer, 29 F.3d at 1084 (quoting McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993)).

(Emphasis added.) E.E.O.C. v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 834 (6th Cir. 1997). Accord, Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 589 (6th Cir. 2002). Under the first and third methods of demonstrating pretext discrimination may be inferred from the circumstances, but under the second method the plaintiff is required to introduce some additional evidence of discrimination. Id. at 589 (citing Kline v. TVA, 128 F.3d 337, 346 (6th Cir. 1997) and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)). The plaintiff always retains the ultimate burden of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993); Newman v. Federal Express Corp., 266 F.2d 401, 405 (6th Cir. 2001). When the foregoing issues are raised upon motion for summary judgment the following applies:

> In the context of a summary judgment proceeding, [St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)] requires that, once the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on [discrimination]. . ." Direct or indirect evidence of discriminatory motive may do but 'the evidence as a whole. . .must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by [discriminatory] animus.'". . .Thus, the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer.

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993), cert. denied, 511 U.S. 1018

(1994). (Citations and footnotes omitted.)  Accord, Manzer v. Diamond Shamrock Chemicals Co., supra at 1083, n.3.

Although disbelief of the employer's proffered reason for employment actions together with the facts making up the prima facie case may suffice to show discrimination, "nothing in law would permit [a court] to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." St. Mary's Honor Center v. Hicks, supra at 514-15.

While plaintiff offers no direct evidence of discrimination by retaliation, she argues that there is at least a genuine issue of material fact pertaining to the elements of a prima facie case of retaliation, as shown by her evidence that: (1) she complained to her supervisor, Mr. Kern, in October of 2001 that Mr. Martin was harassing her; (2) it was after she made the 2001 complaint that she was subject to "a series of write-ups that cumulated in a pre-disciplinary hearing on April 24, 2002," which write-ups she found to have been retaliatory due to the fact that "other TPW employees" were permitted to engage in the same behavior without being disciplined, and the fact that she did not commit the acts alleged; (3) she next complained of harassment in a pre-disciplinary hearing held on April 24, 2002, after which the claim was promptly investigated; (4) upon being reassigned to CPH, she was forced to work the third shift, whereas she had previously worked the first shift, a working condition she found to have been "less favorable"; (5) she was ultimately terminated from employment; and (6) "the specious nature of the alleged infractions" for which she was terminated  provided a causal connection between the protected activity of complaining of sexual harassment and her allegedly unwarranted termination.

This Court is of the opinion that, for each of the following reasons, plaintiff has failed to

offer sufficient evidence of a prima facie case of retaliatory discrimination.

First, to the extent that plaintiff claims that she engaged in protected activity by complaining to Mr. Kerns in October of 2001 about having been sexually harassed by Mr. Martin and that she was subjected to unwarranted discipline as a consequence thereof, a reading of plaintiff's own deposition testimony clearly shows that her vague comment to Mr. Kerns could not have put him on notice of such a complaint and that she made no further attempt to inform her employer of such allegations until the April 24, 2002 pre-disciplinary hearing addressing the numerous disciplinary actions taken against her during the preceding months.

> A. What I told Doug Kern is that I was tired of John's harassment, that I wasn't looking for a man.
>
> Q. Okay. Were you any more specific than saying I was tired of John's harassment and I was not looking for a man?
>
> A. No more specific than that.
>
> Q. That is what you told him?
>
> A. That is what I said.
>
> Q. It was verbally?
>
> A. It was verbally.
>
> Q. Was there anything in writing?
>
> A. Nothing in writing.
>
> Q. Do you recall what Mr. Kern said, if anything, when you told him that?
>
> A. Yes, I do.
>
> Q. What did Mr. Kern say?

15

> A. He laughed.
>
> * * * * *
>
> Q. Did you ever put anything in writing to Mr. Kern?
>
> A. No.
>
> Q. No?
>
> A. No.
>
> Q. Did you ever complain to Mr. Kern after October of 2001?
>
> A. No.
>
> Q. Did you complain to anybody in management at Northcoast Behavioral Health?
>
> A. No. At what time are you speaking of?
>
> Q. Let's say before April of 2002.
>
> A. No, no one in management.
>
> Q. That was the only time you ever complained to management?
>
> A. To management, yes.

Absent such awareness on the part of her employer plaintiff cannot establish a causal connection between her comment to Mr. Kerns and the numerous write-ups which she received between October of 2001 and the April 24, 2002 pre-disciplinary meeting. Without such a causal connection plaintiff cannot demonstrate that those disciplinary actions were retaliatory in nature.

Furthermore, although plaintiff alleges that she was disciplined for behavior for which "other TPW employees" who engaged in the same behavior were not disciplined, she fails to identify such employees and the circumstances surrounding their discipline, rendering this a mere self-serving

statement of no evidentiary value.

As regards her reassignment to CPH, the evidence shows that this reassignment afforded plaintiff with a second chance to avoid termination, provided that she enroll in the EAP and successfully complete the program. Her acquiescence in the second chance agreement was evidenced by her signature on a memorandum, the subject of which was "Action in Abeyance pending EAP– Receipt of Notice and Decision," as well as her signature on the document captioned, "Ohio EAP Participation Agreement Procedure." Plaintiff also enrolled in EAP on May 16, 2002 and showed up for work at CPH without protest. Plaintiff provides no evidence that this second chance at employment was punitive, or retaliatory, in nature.

Plaintiff has also failed to provide any evidence that her shift assignment, her interactions with Ms. Pason, her new supervisor, or with Ms. Cynthia Penn, her EAP coordinator, or her ultimate termination for failure to comply with the terms of the EAP had anything to do with her having made allegations of harassment by Mr. Martin. Instead, the evidence overwhelmingly show that her ultimate termination was a direct consequence of her own conduct.

There being no direct evidence or evidence supporting a prima facie case of retaliation, summary judgment is warranted.

Having failed to establish a prima facie case for the discrimination alleged, the plaintiff has failed to meet her burden of production and, therefore, there is no reason to address the defendant's legitimate, non-discriminatory reasons for the actions taken or to address the issue of pretext. However, if such a review was undertaken, this Court would find that the defendant has provided sufficient evidence of legitimate, non-discriminatory reasons for the disciplinary actions taken against plaintiff, by way of documentation and testimony addressing the numerous employment

infractions committed by plaintiff.

As evidence of pretext, plaintiff offers only her self-serving denials that she engaged in the conduct with which she was charged by her supervisors and EAP coordinator, which are unconvincing and fail to establish a genuine issue of material fact as to pretext.

In light of all the foregoing, this Court is of the opinion that there are no genuine issues of material fact on the claims raised by plaintiff and that defendant is entitled to judgment as a matter of law.

s/DAVID S. PERELMAN<br>United States Magistrate Judge

DATE:    January 11, 2006